IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| ex rel., ROBERT S. CONOVER : | |
| : | |
| v. : | Civil No. CCB-09-356 |
| : | |
| TODD M. ANTHONY, et al. : | |

## MEMORANDUM

Robert S. Conover has sued twenty-seven members of the Maryland Air National Guard ("the defendants") on behalf of the United States government pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)(1).[1] Captain Conover alleges that the defendants submitted false claims for payment to the United States for training missions which they did not complete. Now pending before the court is the defendants' motion to dismiss for lack of subject matter jurisdiction. For the reasons stated below, the defendants' motion will be granted.

## BACKGROUND

Capt. Conover, the *qui tam* relator, is an officer in the Maryland Air National Guard ("MDANG") employed as a dual-status technician pursuant to 10 U.S.C. § 10216(a). (*See* Compl. ¶ 6.) The defendants also are present or former officers in the MDANG. Capt. Conover's allegations against the defendants arise out of military training flights conducted as part of Inactive Duty for Training by the 104th Fighter Squadron, 175th Wing. The 104th Fighter

---

[1] Counts I-III of Capt. Conover's complaint are brought on behalf of the United States pursuant to the FCA. Count IV seeks injunctive relief relating to Capt. Conover's security clearance and lack of promotion. (*See* Compl. ¶ 344-360.) Because Capt. Conover's security clearance has been reinstated, he has abandoned Count IV of his complaint.

1

Squadron is an attack fighter squadron that flies the A-10C, Thunderbolt II, commonly known as the "Warthog." Although the 104th Fighter Squadron is a unit within the MDANG, it receives federal funds to compensate members of the MDANG for conducting training exercises in accordance with minimum federal guidelines. This training prepares members of the MDANG in case it becomes necessary to activate them to federal duty. In the past decade, the 104th Fighter Squadron has been activated for federal duty and deployed overseas for combat operations on five occasions.

The Air National Guard Instruction 36-2001 ("ANGI 36-2001") provides federal guidelines for training members of the MDANG. Section 1.3.7 of the ANGI 36-2001 authorizes members of the Air National Guard not in active federal service to perform Inactive Duty for Training ("IDT") under 32 U.S.C. §§ 502(a)(1) or 502(f). (*See* ANGI 36-2001, Relator's Ex. 1.) IDT includes Additional Flying Training Periods ("AFTPs"), which allow fighter pilots, like the defendants, to "achieve and maintain a high level of flight proficiency in order to promote flight safety and improve the readiness posture of the [Air National Guard]." (*Id.* at §§ 1.3.7 and 9.1.) Under the guidelines established in the ANGI 36-2001, a pilot may receive training pay and points credited toward retirement pay for no more than two AFTPs per day. (*Id.* at § 9.4.4.) Each AFTP must last at least four hours in duration and include at least one "sortie" (a takeoff and landing). (*Id*. § 9.4.5 and 9.4.6.)

On November 2, 2003, several defendants who were Capt. Conover's superior officers confronted him for allegedly claiming payment for completing AFTPs that he did not actually fly. (*See* Compl. ¶ 303.) The defendants accused Capt. Conover of submitting false claims for payment and commenced an internal investigation into his conduct. (*Id.* at ¶ 304.) During the

course of the investigation, which lasted from November 19, 2003 to March 16, 2004, Capt. Conover informed the investigating officer that, since 1999, he had observed other pilots claim payment for flying AFTPs that they had not actually flown. (*Id.* at ¶ 305.) Capt. Conover also informed the investigating officer that several pilots had taught him and others this technique to maximize pay without taking leave. (*Id.*) The investigating officer subsequently interviewed Richard C. Davison, Robert M. Ginnetti, Richard D. Hunt, and Edward S. Jones, all of whom are defendants in the current action. (*Id.* at ¶ 307.) Each of the defendants denied they had ever filed a claim for payment for AFTPs that they did not actually fly, or that they had instructed Capt. Conover on how to do so. (*Id.*)

On November 6, 2004, the MDANG notified Capt. Conover that involuntary discharge proceedings had been initiated against him. (*Id.* at ¶ 309.) As part of this administrative proceeding, Capt. Conover's attorney requested production of, and was given, NGB Form 105Ms that documented payment claims and AFTO Form 781s that documented actual flight times for pilots serving in Capt. Conover's squadron, including the defendants in this action. A military tribunal convened from January 12, 2007 through January 14, 2007 to consider the charges against Capt. Conover. The tribunal ultimately cleared Capt. Conover of any misconduct. (*Id.* at ¶¶ 321, 324.)

On February 13, 2009, Capt. Conover filed this action under seal, as required by 31 U.S.C. § 3730(b)(2). Capt. Conover alleges that the defendants defrauded the government by: (1) submitting payment claims for AFTPs when they did not actually fly on the specified date, and (2) submitting payment claims for performing two AFTPs in a single day when they completed only one flying AFTP and a short "out-and-back" (when a pilot takes off, flies a short distance,

lands for a few minutes, takes off, and then returns to base).[2] On April 20, 2010, the government declined to intervene in the action, and the seal on the case was lifted. On June 24, 2010, the defendants filed a motion to dismiss for lack of subject matter jurisdiction. The relator has opposed the motion.

## **ANALYSIS**

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotations marks and citation omitted). The plaintiff bears the burden of proving that subject matter jurisdiction exists. *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." *Id.* at 348 (quoting *Adams*, 697 F.2d at 1213). When considering a Rule 12(b)(1) motion, the court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647 (internal quotation marks and citation omitted).

The FCA's intramilitary immunity provision bars a former or present member of the armed forces from asserting a *qui tam* action against another member of the armed forces if the action arises out of that person's service in the armed forces. *See* 31 U.S.C. § 3730(e)(1).

---

[2] The defendants dispute whether the ANGI 36-2001 prohibits "out-and-backs." For the purposes of this motion, the court will assume the relator's interpretation is correct.

Because Capt. Conover is a current member of the MDANG, and the defendants are present and former members of the MDANG, the intramilitary immunity provision appears to bar this *qui tam* action. At least one federal court has held that the statutory language of the FCA's intramilitary immunity clause acts as an "unequivocal bar" against such actions. *See United States ex rel. Karr v. Castle*, 746 F. Supp. 1231, 1248 (D. Del. 1990), *withdrawn in part on reconsideration on other grounds*.[3] The relator nonetheless contends that the FCA's intramilitary immunity provision does not extend to members of the National Guard when they are not in the active service of the United States.[4]

The intramilitary immunity provision of the FCA states: "No court shall have jurisdiction over an action brought by a former or present member of the armed forces . . . against a member of the armed forces arising out of such person's service in the armed forces." 31 U.S.C. § 3730(e)(1). The FCA fails to provide a definition for the term "armed forces." *See* 31 U.S.C. § 3701. The statutory evolution of the FCA, however, sheds some light on the meaning of the term as contemplated by § 3730(e)(1). As the Supreme Court explained in *Vermont Agency of Natural*

---

[3] In *Karr*, the relator argued that the defendants were not covered by the FCA's intramilitary immunity clause because they were acting in their civilian capacity rather than their military capacity when they completed their alleged fraudulent acts. The court rejected the argument, finding that the defendants were acting in their military capacity and that, in any event, no law supported the proposition that the FCA's immunity provision depended on the status of the defendants when they acted. *Karr*, 746 F. Supp. at 1248.

[4] Courts have refused to draw a distinction between members of the National Guard and members of the federal military in the context of the intramilitary immunity doctrine announced in *Feres v. United States*, 340 U.S. 135 (1950). *See, e.g.*, *Bowen v. Oistead*, 125 F.3d 800, 805 (9th Cir. 1997). In *Bowen*, the Ninth Circuit explained that:

> [T]he military apparatus of the United States cannot be divided into strictly state and federal components. . . . *Feres* applies to the state National Guards and their members due to the integral role they play as part of the nation's defense force and the substantial degree to which the state National Guards are financed, regulated, and controlled by the federal government even when not called into active federal service.

*Id.* The courts instead have applied the *Feres* intramilitary immunity doctrine "whenever a legal action would require a civilian court to examine decisions regarding management, discipline, supervision, and control of members of the armed forces of the United States." *Id.* at 804 (internal quotations and citations omitted).

*Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the FCA's initial liability provision applied to "any person not in the military or naval forces of the United States, nor in the *militia called into or actually employed in the service of the United States*." 529 U.S. at 782 (internal quotations omitted) (citing Act of Mar. 2, 1863, ch. 67, § 3, 12 Stat. 698) (emphasis added). Thus, in its initial version, the FCA exempted persons in the militia from liability only when they were called into or employed in the service of the United States. In 1982, Congress replaced the phrase "any person not in the military or naval forces of the United States, nor in the militia called into or actually employed in the service of the United States" with the phrase "[a] person not a member of an armed force of the United States." *See id.* (citing 31 U.S.C. § 3729 (1982 ed.)). The Court in *Vermont Agency* labeled this a "housekeeping change" intended to incorporate the term of art "member of the armed forces" as used in Title 10 of the United States Code. *Id.* In 1986, Congress replaced the phrase "[a] person not a member of an armed force of the United States" with the term "[a]ny person." *See* 31 U.S.C. § 3729(a)[5]; *see also Vt. Agency*, 529 U.S. at 782-83. In doing so, Congress eliminated the blanket liability exemption for members of the armed forces, permitting an action by the United States. *See* S. Rep. No. 99-345, at 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5226, 5283. At the same time, however, Congress included an intramilitary immunity provision in the FCA to bar *qui tam* actions between members of the armed forces. *See* 31 U.S.C. § 3730(e)(1).

Based on this legislative history, the relator urges the court to interpret the term "armed forces" in § 3730(e)(1) according to the definition provided in Title 10 of the United States Code. Title 10 defines the term "armed forces" as "the Army, Navy, Air Force, Marine Corps,

---

[5] 31 U.S.C. § 3729(a) now states: "any person who" knowingly makes a false claim for payment "is liable to the United States Government for a civil penalty."

6

and Coast Guard." 10 U.S.C. § 101(a)(4). The "Air Force" is further defined as "the Regular Air Force, the Air National Guard of the United States, the Air National Guard *while in the service of the United States*, and the Air Force Reserve." 10 U.S.C. § 8062(d)(1) (emphasis added). The "Air National Guard" consists of "the organized militia of the several States" that is an "air force," *see* 10 U.S.C. § 101(c)(4),[6] and includes the MDANG. The relator contends that the MDANG was not part of the "armed forces" during the times relevant to this case because it was not operating "in the service of the United States." Assuming that the Title 10 definition of the term "armed forces" applies to the FCA, it may be that the MDANG, as an *organization*, was not part of the "armed forces" during the times relevant to this case. The MDANG was not at any time "in the service of the United States." The defendants, however, argue that, regardless of whether the MDANG was "in the service of the United States," the defendants, as *individuals*, were members of the armed forces due to their dual enlistment in the National Guard of the United States. *See Perpich v. Dep't of Defense*, 496 U.S. 334, 345 (1990) (explaining that "[s]ince 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States."). Under this dual enlistment system, the defendants enlisted as members of the Air National Guard of the United States ("ANGUS") when they enlisted in the MDANG. Because ANGUS is part of the reserve component of the Air Force, *see* 10 U.S.C. § 10111, the defendants argue that they were members of the reserve

---

[6] 10 U.S.C. § 101(c)(4) states:

> The term "Air National Guard" means that part of the organized militia of the several States and Territories, Puerto Rico, and the District of Columbia, active and inactive, that—
>
> (A) is an air force;
> (B) is trained, and has its officers appointed, under the sixteenth clause of section 8, article I, of the Constitution;
> (C) is organized, armed, and equipped wholly or partly at Federal expense; and
> (D) is federally recognized.

7

component of the federal armed forces and that, therefore, the intramilitary immunity clause bars the relator's *qui tam* action. The relator argues that, although a state guardsman simultaneously enlists as a member in the reserve component of the federal armed forces, his membership in either organization is mutually exclusive. In other words, at one time, a guardsman can only be a member in the state National Guard or the federal armed forces, and cannot simultaneously be a member of both.

In *Perpich*, the Supreme Court held that when a member of the National Guard is called into federal service, he is relieved of his status in the state militia for the entire period of federal service. 496 U.S. at 346. In doing so, the Court explained that "all [members of the National Guard] must keep three hats in their closets—a civilian hat, a state militia hat, and an army hat—only one of which is worn at any particular time." *Id.* at 348; *cf. Estate of Burris v. State*, 759 A.2d 802, 809-810 (Md. 2000) (explaining that dual enlistment results in a "triple status" whereby a guardsman simultaneously holds status as a member of the State National Guard, the National Guard of the United States, and the militia as manifest in 10 U.S.C. § 311, which includes both the members of the State National Guard (the organized militia) and those who are not members of the State National Guard (the unorganized militia)). The relator contends that *Perpich* thus stands for the inverse proposition that when a guardsman is not called into federal service, he is relieved of his status in the federal armed forces. *See Clark v. United States*, 322 F.3d 1358, 1365-66 (Fed. Cir. 2003) ("We understand *Perpich* to stand for the proposition that members of the National Guard only serve the federal military when they are formally called into the military service of the United States.").[7]

---

[7] In *Clark*, the Federal Circuit interpreted whether 37 U.S.C. § 206(d) applied to members of the National Guard. At the time, 37 U.S.C. § 206(a) provided that "a member of the National Guard *or a member of a reserve component* of

Even if the court assumes that a guardsman can only wear either his state militia hat or his army hat at one time, the statutory scheme governing the training of dually enlisted guardsmen supports the contention that the defendants were serving in the federal, not state, capacity when conducting their AFTPs. Section 501 of Title 32, which governs the training of state guardsmen, states: "The training of the National Guard shall be conducted by the several States, the Commonwealth of Puerto Rico, the District of Columbia, Guam, and the Virgin Islands in conformity with this title." 32 U.S.C. § 501(b). At the same time, however, § 502(a) requires guardsmen to assemble for inactive duty training at least 48 times each year under regulations issued by the federal, not state, government. *See* 32 U.S.C. § 502(a)(1).[8] Section 502(f) also allows the federal government to order guardsmen to perform training or duty in

---

a uniformed service who is not entitled to basic pay . . . is entitled to compensation, at the rate of 1/30 of the basic pay authorized for a member of a uniformed service of a corresponding grade entitled to basic pay." 37 U.S.C. § 206(a) (1994) (emphasis added). Section 206(d), however, excluded compensation for work or study performed in connection with correspondence courses only for members of the reserve components of the armed forces, not for members of the National Guard. 37 U.S.C. § 206(d) (1994). To avoid making Congress's delineation of who was entitled to compensation in § 206(a) superfluous, the Federal Circuit held that guardsmen serve solely in the state militia when not called into active federal service. *Clark*, 322 F.3d at 1365-66. By contrast, in an opinion analyzing the application of the Privacy Act to the National Guard, as an agency, the D.C. Circuit explained that "[a]lthough *Perpich* . . . stands for the proposition that federally activated guardsmen temporarily lose their State National Guard status, nothing in the decision's holding severs the continuous link between the Army National Guard of the United States and federally recognized units of the Army National Guard when not on active federal service." *In re Sealed Case*, 551 F.3d 1047, 1052 (D.C. Cir. 2009).

[8] Title 32 U.S.C. § 502(a) states:

> Under regulations to be prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, each company, battery, squadron, and detachment of the National Guard, unless excused by the Secretary concerned, shall—
>
> (1) assemble for drill and instruction, including indoor target practice, at least 48 times each year; and
>
> (2) participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year.
>
> . . .

addition to that required under § 502(a). *See* 32 U.S.C. § 502(f).[9] Federal laws treat training completed by guardsmen under § 502 distinctly from training completed by guardsmen strictly in their state capacity. For example, Title 10 provides that, for the purposes of providing benefits to guardsmen, "inactive-duty training performed by a member of the Air National Guard of the United States in his status as a member of the Air National Guard, in accordance with regulations prescribed under section 502 of title 32 or other express provisions, shall be considered inactive-duty training in *Federal service as a Reserve of the Air Force*." 10 U.S.C. § 12602(b)(3) (emphasis added). The Federal Tort Claims Act ("FTCA") also defines federal employees to encompass "members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32." 28 U.S.C. § 2671. The foregoing provisions of the statutory scheme governing the National Guard support the contention that guardsmen training pursuant to § 502 serve in their federal, rather than state, capacities.

At least one circuit court has held that guardsmen training under § 502 serve in their federal capacities. *See Matreale v. New Jersey Dept' of Military & Veteran Affairs*, 487 F.3d 150, 156 (3d Cir. 2007). In *Matreale*, a member of the New Jersey Army National Guard attempted to bring a state law discrimination claim against the state agency overseeing his service. The plaintiff argued that the intra-military immunity doctrine announced in *Feres v. United States*, 340 U.S. 135 (1950), did not bar his claim because his injuries were sustained in the course of training conducted in his state status under 32 U.S.C. § 502. *See Matreale*, 487 F.3d at 154-55.

---

[9] Title 32 U.S.C. § 502(f) states:

> (1) Under regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may . . . be ordered to perform training or other duty in addition to that prescribed under subsection (a).
>
> . . .

10

According to the plaintiff, this made him a state, rather than a federal, employee to whom the *Feres* doctrine did not extend. The Third Circuit rejected this argument, explaining that the plaintiff was a federal employee, or at best a dual federal-state employee, because he was training under orders issued pursuant to federal law, specifically 32 U.S.C. § 502(f). *Id.* at 156-57 ("Our conclusion that a state guardsman serving under orders issued pursuant to Title 32, whether serving under § 502(a) or § 502(f), has and retains his federal status, along with his state status, even when he has not been called to active duty under Title 10, likewise recognizes federal supremacy over military affairs.").[10]

Here, the defendants conducted their AFTPs as part of inactive duty training pursuant to § 1.3.7 of the ANGI 36-2001. Section 1.3.7 authorizes training under 32 U.S.C. §§ 502(a)(1) or (f).[11] Whether the defendants conducted their AFTPs under § 502(a)(1) or (f), they were performing inactive duty training required under federal law in accordance with regulations issued by the federal, not state, government. Moreover, their training was considered to be "in Federal service as a Reserve of the Air Force" for the purposes of 10 U.S.C. § 12602(b)(3), they were paid with federal funds, and they were considered federal employees under the FTCA. Thus, even though they were not actively called into federal service, the defendants were wearing their "army hat" when they allegedly submitted false claims for payment to the

---

[10] The *Feres* doctrine has been applied in a number of cases to bar suits by members of the National Guard against the government. *See, e.g.*, *Bowen*, 125 F.3d at 804-05. While the FCA contains its own immunity provision, which the relator argues is different from the "activity incident to service" language of *Feres*, 340 U.S. at 146, the principles supporting application of intramilitary immunity to claims under the FCA are the same as those underlying the *Feres* doctrine.

[11] Section 1.3.7 of the ANGI 36-2001 also authorizes training under 37 U.S.C. § 1002. Section 1002 authorizes additional training for guardsmen without pay. Here, the defendants were paid for their training. Indeed, the relator's claim would not exist if the defendants were not paid for their training. Thus, the court assumes that the defendants did not conduct their inactive duty training under 37 U.S.C. § 1002.

government.[12] Accordingly, the defendants were serving as members of the federal armed forces as contemplated by the FCA. The FCA's intramilitary immunity provision bars the relator's *qui tam* action against the defendants and this court lacks jurisdiction under 31 U.S.C. § 3730(e)(1).[13]

A separate Order will be entered dismissing this case.


February 9, 2011                                                      /s/
Date                                                                 Catherine C. Blake
                                                                      United States District Judge

---

[12] The relator does not dispute that Capt. Conover was a member of the federal armed forces, specifically the Air Force Reserves, because of his employment as a dual-status technician. *See* 10 U.S.C. § 10216(a)(1)(B) (requiring, as a condition of employment for dual status technicians, membership in the Selected Reserve). The Selected Reserve "consists of units . . . of Reserves, trained as prescribed in section 10147(a)(1) [of title 10] or section 502(a) of title 32." 10 U.S.C. § 10143(a).

[13] In light of this holding, I need not address the defendants' other arguments in support of dismissal.